My name is Joel Levine. I'm counsel for Mr. Tath. Pardon my voice. The issue that I would like to focus most of my comments on this morning, and I'm not sure I know the Court was quite generous in affording us 15 minutes per side for this argument. I'm not sure it will even require that. I'd like to talk about the uncharged misconduct, which we raise in the first part of our brief. Let me give you a little bit of a backdrop. This defendant and three or four others were charged with a Medicare fraud involving a business called UMS. And towards the end of the UMS lifetime, the defendant appeared to be attempting to open up another business in Atlanta, Georgia, without the other defendants and a business which never submitted a claim. My understanding of the facts is that he applied for a Medicare number, had some forms printed up, and nothing ever happened after that. His lawyer made a motion. I was not his trial counsel. His lawyer made a motion pretrial to eliminate, to keep that evidence from coming before the jury. During the course of the trial, he renewed that eliminate request. The district court, in analyzing whether or not this evidence should have been submitted, our position was somewhat elusive in terms of what the justification for it was. The district court said, to my knowledge, that this evidence regarding revive was intertwined or inextricably intertwined with the evidence regarding UMS, which was the crux of the indictment and took up most of the time at this trial. It's our position that that could not be. The other defendants were not charged or had nothing to do with revive. Indeed, and add to that the fact that no claim was ever made regarding revive, no false or correct claim. But wasn't the argument for admitting this evidence of the revive organization that was set up in this very sort of quick way and I think you described the facts accurately with respect to revive. It was offered to show intent, understanding, knowledge on the part of your client. They basically, the UMS organization is under investigation. They're no longer paying and he starts to set up another organization and then after that all hell breaks loose and they can't do anything else. Let me respond to this one. This was a defense where the defendant was contesting his intent but was also contesting his level of participation. And the evidence regarding this other company coming before the jury, in our view, tends to show propensity in a situation where he has the right to contest both sides of a fraud case. He has the right to contest whether he was involved enough in the crime and whether he had the requisite intent. And he did both in this case. So in attempting to analyze what the district court did here as merely an invocation of some intent theory, I don't think that's what the district court did. In fact, the district court's comments were similar to the comments I read in the prosecution's brief in that the two types of evidence, the two businesses were inextricably intertwined. And the prosecution in its brief cited a couple of cases. I believe it was page 26 of their brief. One is called Solomon, not like King Solomon, but S-O-L-I-M-A-N, and another one called Warren. And if the court were to compare those two cases to the situation we had, those were the cases cited by the prosecution to justify the court's ruling that the two sets of facts were inextricably intertwined. And in Solomon, you had a situation where all the defendants in that case were charged in the district court together, but they weren't charged with all of the crimes that they could have been charged with. That's different than our situation, because Mr. Luong, Ms. Pham, the other defendants in our case, were not charged with anything having to do with Revive. And when the district court admitted the evidence, he did so with a limiting instruction saying, please don't consider this evidence regarding these other defendants. I'm reminded of that from a comment that I heard about 15 minutes ago from the court. Nothing draws attention to something more than a limiting instruction, and I think that's what happened here. And his lawyer, Mr. Tath's lawyer, objected to the limiting instruction in that it drew further attention to his particular involvement in Revive. And in the final analysis, it's our position that when a district court has to make a decision regarding 404B evidence, other uncharged misconduct, it's a balancing test where the probative value has to outweigh the prejudice. And when you have a situation like we had in this particular case, where the other defendants weren't involved, no claims were made, and I don't mean no illegal claims. We don't even have any illegal claims. We had no claims made, period. We had some papers. Other than the fact that there were no claims that were made by the new company, Revive, how substantively was that company different, especially with Mr. Tath's involvement? How was it different than UMS? It was the same exact procedure that was going to be followed, correct? I'm not sure if it was exactly the same, but let's assume it was. The evidence was never really developed to the point where that question could be answered to its full extent, because the only evidence that came before the jury were these forms and applying for a Medicare ID number. It was the same doctors, too, right? One of the same doctors. One, okay. One of the same doctors. But the other defendants who were allegedly helping to perpetrate the UMS fraud were successful in asking the district court to give a limiting instruction that had nothing to do with them. With that, I'm prepared to submit I had no intention of orally arguing the other issue in the brief unless the Court has some questions regarding that, and I would like to reserve a couple of minutes on the far end. Okay. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Jeannie Joseph on behalf of the United States. I, too, will address, I guess, focus my oral argument relating to the first issue, and I think, again, it's whether the district court abuses discretion in admitting this 404B evidence. I know defense counsel has fashioned it more in terms of inextricably intertwined evidence, but I think it's clear from the district court's rulings and its limiting instruction that what he was doing was admitting it as 404B evidence, although he gave that ruling as the alternative. And that's because that's how he instructed the jury in limiting and giving the limiting instruction and at the close of the evidence during the jury instructions. And I think there's a couple of factual issues that were a little bit erroneous. I think what the evidence established was that when UMS was placed on prepayment review and Medicare said stop paying them and said we're not going to pay any more of these claims unless you submit the supporting documentation. That is when Sarah Taft, the defendant, as well as a co-defendant who, when he testified at trial, he had already pleaded guilty, set forth on this new course to create a company called Revive out of Georgia. And it was to submit not only the claims that were being rejected already, but to submit all of these new claims that continued to be generated by Dr. Khartibu's office. At this point, Dr. Hubbard had already fled and left the scheme. And the evidence is clear, and the evidence was put on through VUWIN as well as documents that were obtained upon execution of the search warrants that they had already applied and obtained a Medicare number. And they were about to bill this in about April of 2004. The only thing that stopped them from billing this is the execution of the search warrants. And that was the happenstance that stopped that scheme from going forward. But these were the exact same fraudulent claims that UMS had generated from the same doctor, the same claims, the same office. It was a continuation through another company in the hopes to avoid that Medicare scrutiny that had been finding these claimed suspects, to avoid that by using another company, showing, again, I think indicating the defendant's fraudulent intent. And that's what it was offered for. What drew this scheme to the attention of the Medicare authorities in the first place? I believe the evidence was that it was beneficiary complaints, people who called the hotline upon receiving their explanation of benefits saying, oh, my gosh, these huge bills for internal nutrition and wheelchairs that we didn't get. It was also a mining of the billing data, which is a very common way that the Medicare fraud side of the claims process works when they see these suddenly generating high numbers. And you saw that the evidence was that UMS, who just came into existence in early 2003, within a few months was billing up to a million dollars a month from this scheme. So I think that's the first issue. I think the district court correctly analyzed the four-part test. That is sort of the law of the circuit. Analyzed those four factors, found that this evidence was 404B evidence, and, you know, admitted this evidence with an appropriate instruction to the jury. I think the district court did nothing wrong. It certainly did not abuse its discretion. And then there's also the sufficiency argument. I know defense counsel didn't talk about that. I think there's a lot of evidence, a lot of excerpts of record. I think, you know, viewing the evidence in the light most favorable to the government, which is the standard, could any rational trier of fact have found the defendant guilty? You know, if the government submits that the answer is yes, the government presented an overwhelming amount of evidence that this defendant participated in this Medicare fraud scheme. And, in fact, the district court found that this defendant had a managing role in the scheme. And I'm happy to go through that evidence. The defendant was a number of witnesses testified. He was Luong's partner. Luong was the owner of United Medical Supply.  And those doctor's offices generated approximately 80% of all of the claims that United Medical Supply submitted. The defendant was there daily. He's the one that trained the employees how to generate the paperwork, the very paperwork that was used to commit this Medicare fraud scheme, those application packets. He ordered them to gather together a copy of their Medicare card with the marketer's name written on it so they could keep track of the marketers and pay the kickbacks to them, the blank certificates of medical necessity that were signed by the doctors, the blank delivery tickets that were signed by the patients, and the prescriptions from the doctors. And the defendant was there. He could see these van loads of patients being driven and dropped off at these doctor's offices. He knew they were being induced by being given these boxes of internal nutrition, three boxes for diabetics, four boxes for regular patients. He knew the doctors saw these patients. He saw 20 to 30 new patients a day, never to be seen again. He saw the doctors see them for 5 to 10 minutes at most. Sometimes the translator wasn't there. They couldn't even speak to each other. But every time they'd be given a prescription for internal nutrition, I think it was 98% of the time it was Dr. Katibloo. He saw patients walking in there being given wheelchairs. I won't speak for my fellow panel members, but on this point I am convinced. I'm sorry? I will not speak for my fellow panel members. I will say, however, for myself, on this point I am convinced. All right. Thank you. I'll be brief. I think the last part is just the money aspect. Nothing is put in his name. He puts it in the name of others. He receives $3.7 million in less than a year period, not being given directly to him, but through his sham companies, ultra care, the doctor's offices. So I think that, again, this is so far removed from a normal doctor-patient situation. It screams fraud. And certainly he is dealing with all the documents showing the Medicare fraud, and his commission is actually based on 50% of what Medicare pays. So with that, unless your honors have any further questions, I will submit. Okay. Thank you. Response? I have only one comment, Your Honor. It goes back to the revived testimony, the revived evidence, and that is that a comment was made a couple of minutes ago that the revived evidence was designed to submit additional false claims having to do with the services of Dr. Katlibu. I don't think any evidence was introduced at the trial that that happened. And it may be speculation. It actually may be a calculated guess. Maybe that's what they had in mind, but no evidence was introduced regarding the use of revived for that purpose for false claims. Okay. Thank you. Thank you.
judges: Tunheim, Canby, Fletcher W.